IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JEFFREY KUHNS,                     )
                                   )
                    Plaintiff,     )
                                   )
        vs.                        )        Civil Action No. 08-1145
                                   )        Chief Judge Donetta W. Ambrose
COMMISSIONER OF                    )        Chief Magistrate Judge Amy Reynolds Hay
SOCIAL SECURITY,                   )
                                   )
                    Defendant.     )

## REPORT AND RECOMMENDATION

I.      Recommendation

        Acting pursuant to 42 U.S.C. § 1383(c)(3), Jeffrey Kuhns ("Kuhns" or "the claimant")

appeals from a June 26, 2008  final decision of the Commissioner of Social Security ("the

Commissioner") denying his application for supplemental security income benefits.[1]

Cross-motions for summary judgment are pending.  It is respectfully recommended that the

Commissioner's Motion be denied, and that the claimant's Motion be granted insofar as it

requests that this matter be remanded to the ALJ for further analysis of the claimant's mental

impairments.

II.     Report

        A.  Procedural History

        On March 4, 2004, Kuhns filed an application for disability and supplemental security

_____

        [1]Although Kuhns's application also alleged physical impairments and requested an award of
disability insurance benefits pursuant to 42 U.S.C. §§  401- 433, he does not contend that the
Commissioner erred in denying this portion of his claim.  Furthermore, Kuhns does not challenge the
ALJ's finding that his physical impairments do not entitle him to SSI benefits.  Consequently, the Court
confines its attention to Kuhns's argument that the ALJ erred in determining that he was not entitled to
SSI benefits based on his mental impairments.

income benefits, alleging that he became disabled on January 15, 1994.  This claim was denied in

a decision dated June 17, 2004.  Kuhns requested a hearing which began on August 1, 2005.  The

hearing was continued in order to permit Kuhns to submit additional medical evidence.  It

resumed and concluded on January 5, 2006.  Kuhns, who was represented by counsel, testified, as

did his mother and a vocational expert.  On April 26, 2006, the Administrative Law Judge

("ALJ") issued a decision finding that Kuhns was not disabled.  (T. 878).  Kuhns's request for

review was denied by the Appeals Council on June 26, 2008, making the ALJ's opinion the final

decision of the Commissioner.  This appeal followed.

     B.  The Hearing Testimony

     At the time of the hearing, Kuhns was a forty two year old man who had completed high

school and trained as a truck driver, welder, and auto body repairman.  (T. 928).  Kuhns testified

that prior to 1994 he had worked as a car salesman and for a department store building, installing

and stocking shelves.  (T. 933-944).  He also had experience as a precision die finisher, truck

driver, security guard, key puncher, building maintenance worker, meter reader, and press

operator.  (T. 935-39).  Kuhns told the ALJ that his back was injured in 1994, and he had been

unable to return to work.  He then detailed his physical symptoms, alleging that after the injury he

was "constantly depressed."  (T. 945-46).  Although the depression persisted, he did not consult

and was not referred to a psychiatrist or other mental health professional for treatment until

roughly the middle of 2003. [2]

     Kuhns described a fairly broad range of daily activities.  He watched television, read

newspapers, paid bills, ate out about once a month, visited with family and friends in their homes

---

[2]The record reflects that Kuhns actually began treatment in the middle of 2004.

and in his, collected arrowheads, and enjoyed fishing and watching football. (T. 887-88). He was capable of taking a shower, but could not bathe in a tub because of the pain getting out. (T. 888-89). He could prepare simple meals, drive fifty to sixty miles per week, dust, and sweep with some difficulty. He could fill a dishwasher, wash dishes if he took a break during the process, and take out small bags of trash. (T. 890). He was able to grocery shop "in small doses." Id.

At the second installment of his hearing, Kuhns was asked if his medications had changed since August 5, 2005. He testified that he had received a prescription for Ativan, and that his antidepressant had been changed to Seroquel. (T. 897-98). When asked if there was more about his health that he wished to discuss, Kuhns responded, "Does severe depression count?" (T. 898). He stated that depression sometimes "freezes him in his tracks." Id. He also testified that he had anxiety attacks when, for example, the doorbell rang, or he heard a car on his road. (T. 899). He said that he saw licensed clinical social worker, Edward Stemple ("Stemple"), about once a month, but that Stemple's office had moved two appointments. Kuhns also missed an appointment on a day when it took him four hours to get out of bed. Id. He stated that he saw Dr. Orr, a psychiatrist, once every three or four months.

Kuhns's mother testified next, detailing her observations of Kuhns's physical limitations.

The ALJ then described Kuhns's past work experience for the vocational expert, and posited a hypothetical individual of the same education and work experience as the claimant who was limited to light exertion. This person could not use ropes, ladders or scaffolds, could crouch and stoop occasionally, needed a sit-stand option for sedentary work, could balance and perform postural maneuvers, and could occasionally push-pull with the lower extremities. The individual

3

could lift less than five pounds frequently and heavier objects occasionally.  He could not tolerate prolonged exposure to extreme temperatures, wetness, or humidity, and could not be exposed to moving machinery or unprotected heights.  The ALJ did not include in the hypothetical any of the mental impairments alleged by Kuhns.  The expert testified that a person with the capacity described could perform jobs that were available in substantial numbers in the national economy. (T. 911-917).

In his decision, the ALJ applied the sequential five step analysis articulated at 20 C.F.R. §§ 404.1520(a) and 416.1920(a),[3] concluding that Kuhns was not disabled within the meaning of the Social Security Act ("the Act").  At step two, the ALJ found that Kuhns's mental impairments were "not 'severe.'"  (T. 17).  He analyzed Kuhns's physical impairments through step five, finding that although they prevented him from performing past relevant work, the claimant had the residual functional capacity to perform jobs existing in significant numbers in the national economy, and thus was not disabled.

C.  The Documentary Evidence

J. Stephen Carter, M.D., a psychiatrist at Latrobe Area Hospital, first evaluated Kuhns on June 7, 2004.  Kuhns claimed to have been depressed off and on for several years, and reported

---

[3]  The familiar five steps are as follows: (1) If the claimant is performing substantial gainful work, he is not disabled; (2) If the claimant is not performing substantial gainful work, his impairment(s) must be "severe" before he can be found to be disabled; (3) If the claimant is not performing substantial gainful work and has a "severe" impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment (or impairments) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is presumed disabled without further inquiry; (4) If the claimant's impairment (or impairments) does not prevent him from doing his past relevant work, he is not disabled; (5) Even if the claimant's impairment or impairments prevent him from performing his past work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

suffering from anxiety.  (T.  401).  Dr. Carter told Kuhns that he would not prescribe addicting

drugs.  Kuhns "was okay with that."  Id.  Kuhns was assigned a GAF score of 45, and was

diagnosed with "Major Depression, Recurrent" and "Generalized Anxiety Disorder."  Id. [4]  Dr.

Carter prescribed Lexapro and Vistaril, and referred  Kuhns to the Hospital's mental health unit

for outpatient therapy. (T. 401).

On June 26, 2004, Dr. Carter increased the dosage of Kuhns's antidepressant based on a

phone message that the anxiety medication was not working. The anxiety medication was

changed.  (T. 400).  At a June 29, 2004 meeting with Dr. Carter, Kuhns reported that his

symptoms had not improved.  (T. 399).  The claimant was scheduled to meet with licensed

clinical social worker Michael Mulcahey ("Mulcahey") [5] at Latrobe Hospital on July 27, 2004,

but did not keep the appointment.

On September 23, 2004, Kuhns called Dr. Carter to report that Seroquel was helping his

anxiety, but that he was still depressed.  (T. 395).  Dr. Carter declined to modify Kuhns's

medications until he could be seen.  Id.  The record shows that Kuhns met with Mulcahey twice

in 2004, but the dates on the records of these sessions are illegible.  The record does show that

Mulcahey assigned Kuhns a GAF of 45 at both meetings.  (T. 393, 394).  In each of the sessions,

Kuhns reported continued depression and sleep problems, but at one stated that his anxiety was

better.  Id.  Dr. Carter saw Kuhns on October 5, 2004.  (T. 391).  The report shows that the

---

[4] "A GAF score of 41-50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'"  Colon v. Barnhart, 424 F. Supp.2d 805, 809 n.3 (E.D. Pa. 2006) (quoting American Psychiatric Association,  Diagnostic and Statistical Manual  34 (4th ed. 2000) ("DSM").

[5] The Commissioner spells this social worker's name "Mulchanee." The Court adopts the spelling used in the hearing transcript.

claimant was more depressed and was still anxious.  On December 6, 2004, and January 5, 2005, Kuhns failed to report for counseling sessions with Mulcahey.  (T. 390).

   The claimant met with Stemple for the first time on May 23, 2005, telling him that he had been unhappy with Mulcahey.  (T. 501).  Kuhns had restricted affect, and appeared to be anxious and depressed.  He reported having gone on vacation, and stated that he enjoyed fishing two times per week.  He also stated that he was having problems with his medicines and took them as he pleased.  Id.  Kuhns missed his next  two appointments with Stemple.  On July 11, 2005, Stemple assigned Kuhns a GAF of 50.  (T. 499).[6]  Kuhns had restricted affect, was anxious, and had poor insight.  Id.  In an August 11 session with Stemple, Kuhns had difficulty concentrating.  He had a flat and restricted affect and a depressed and anxious mood.  He was assigned a GAF of 50.  (T. 827).  Kuhns missed his next four appointments with Stemple.

   On August 16, 2005, Kuhns saw Randall Orr, M.D., a psychiatrist at Latrobe Hospital, who assumed Kuhns's care after Dr. Carter's retirement.  (T. 826, 948).  Dr. Orr wrote that Kuhns appeared sad with restricted affect, and had reported that his depression was still poor.  Dr. Orr assigned Kuhns a GAF of 50, and prescribed Effexor.  (T. 826).  On September 2, 2005, Dr. Orr received a message from Kuhns stating that Effexor was "clogging his head." (T. 825).  Dr. Orr prescribed Buspar.  Id.  On December 12, 2005, Dr. Orr saw the claimant again.  Kuhns asked for Valium, but Dr. Orr responded that Valium was not appropriate, and prescribed Ativan.  Kuhns's GAF was 50. (T. 824).

   Kuhns met with Stemple on December 22, 2005.  (T. 822).  Stemple wrote that Kuhns had

_____

[6]"A score of 50 is on the borderline between serious and moderate symptoms.  GAF scores between 51 and 60 indicate moderate symptoms (e.g. circumstantial speech and occasional panic attacks or moderate difficulty in social or occupational functioning as evidenced by . . . conflicts with peers or co-workers."  Colon, 424 F. Supp.2d at 809 n.3.

made little progress.  Dr. Orr reviewed and signed off on this note.  Id.  At a session on January 24, 2006, Stemple observed that Kuhns was not doing well.  (T. 821).  His grooming was poor, and he reported hearing voices.  His mood was depressed and anxious and his affect was flat.  He raised quality of life issues.  "Is this as good as it gets?"  Id.  His GAF remained at 50.

On February 24, 2006, Dr. Orr completed a Mental Impairment Questionnaire.  He observed that the claimant had been compliant with medicine checks, but had responded poorly to medication and continued to be depressed.  (T. 829).  In light of the lack of response, Kuhns's prognosis was poor.  According to Dr. Orr, Kuhns exhibited depressed mood, a chronically high level of anxiety, a history of panic attacks, and flat affect.  He had also experienced difficulty thinking and concentrating, psychomotor retardation, and emotional withdrawal or isolation.  (T. 830).  Dr. Orr characterized the restrictions on Kuhns's daily activities as mild, his difficulties in social functioning as marked, and his deficiencies of concentration as moderate.  (T. 831).  He also checked an item on the form indicating that Kuhns had a "[m]edically documented history of a chronic organic mental, schizophrenic, or affective disorder of at least 2 years' duration that ha[d] caused more than a minimal limitation on ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support," and had experienced "[t]hree episodes of decompensation within 12 months, each at least two weeks long."  Id.  Last, Dr. Orr checked items on the form indicating that Kuhns would likely miss more than four days of work per month due to his impairment, and that his condition could be expected to last for more than twelve months.  Dr. Orr also noted that Kuhns was not a malingerer, and that he would have difficulty functioning in a regular work environment.  Id.

D.  Standard of Review

7

The Social Security Act ("the Act") limits judicial review of the Commissioner's final decision regarding benefits to two issues: whether the factual findings are supported by substantial evidence, Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988), and whether the correct law was applied. Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984). "Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001).

E.   Discussion

Kuhns challenges the ALJ's finding at step two that his mental impairments were not severe. In evaluating this contention, the Court is guided by the fact that "[t]he step two inquiry is a de minimis screening device to dispose of groundless claims." Newell  v. Comm'r of Soc. Sec., 347 F. 3d 541, 546 (3d Cir. 2003). "If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and the sequential evaluation process should continue." Id. at 546-46. See also McCrea. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004) (same).

The ALJ's conclusion regarding Kuhns's mental impairments was grounded in his rejection of Dr. Orr's findings. He wrote first that he "afford[ed] limited weight to [Dr. Orr's] opinion because the claimant alleges an onset of [a mental] impairment in January 1994 and there is little evidence of depression or anxiety until June 2004." A careful reading of the record shows that although Kuhns does allege that he experienced episodes of depression during the period following his back injury in 1994, he does not contend that the depression and related anxiety became disabling until 2004. See Doc. 10 at 14. Because there is no insured date for SSI benefits, a June 2004 onset date is not fatal to this portion of his claim. The fact that there is little evidence

8

of a mental impairment prior to June 2004 is, therefore, irrelevant.

The ALJ also found it significant that Kuhns did not begin treatment for depression and anxiety until September 2004. (T. 18). This finding is belied by the record. Kuhns began treatment upon his initial visit to Dr. Carter in June 2004. He also attended counseling with Mulcahey prior to September. The error in the ALJ's identification of the date on which Kuhns began treatment is compounded by the fact that in describing the treatment that Kuhns did receive, the ALJ omitted any mention of Dr. Carter's findings, and failed to address Kuhns's appointments with and conclusions drawn by Mulcahey and Stemple.

The Court of Appeals for the Third Circuit has stressed that "the special nature of proceedings for disability benefits dictates extra care on the part of the agency in developing an administrative record and in explicitly weighing all evidence." Doborwshy v. Califano, 606 F.2d 403, 406 (3d Cir. 1979). "Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight [he] has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec. of HEW, 567 F.2d 258, 259 (4th Cir. 1977)).

The ALJ was also obligated to consider the social workers' records. SSR 06-03p, which clarifies how opinions from sources who are "not acceptable medical sources" are to be considered, reads in relevant part:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater

> percentage of the treatment and evaluation functions previously handled
> primarily by physicians and psychologists.  Opinions from these medical
> sources, who are not technically deemed "acceptable medical sources"
> under our rules, are important and *should be evaluated on key issues such
> as impairment severity and functional effects*, along with the other relevant
> evidence in the file.

Id.  (emphasis added).

The ALJ should have addressed, too, the GAF scores assigned by Dr. Carter and Dr. Orr, given that these scores tend to support Kuhns's claim.  "[G]AFs from 45-50 indicate that the person cannot perform competitive work on a sustained basis . . . . "  Schweighauser v. Barnhart, No. 06-1397, 5446496, at *2 (E.D. Pa. Nov. 17, 2006).  The District Court in Colon explained the importance of GAF scores as follows:

> Pursuant to final rules of the Social Security Administration, a claimant's
> GAF score is not considered to have a "direct correlation to the severity
> requirements." 66 Fed. Reg. 50746, 50764-65 (2000).  However, the rules
> still note that the GAF remains the scale used by mental health
> professionals to "assess current treatment needs and provide a prognosis."
> Id.  As such, it constitutes medical evidence accepted and relied upon by a
> medical source and *must be addressed by an ALJ* in making a
> determination regarding a claimant's disability.  Although the ALJ "may
> properly accept some parts of the medical evidence and reject other parts .
> . . he must consider all the evidence and give some reason for
> discounting the evidence he rejects." Adorno v. Shalala, 40 F.3d 43, 48
> (3d Cir.1994).

424 F. Supp. 2d at 812 (emphasis added).   See also Span ex rel. R.C. v. Barnhart, Civ. A.02-CV-7399, 2004 WL 1535768 (E.D. Pa. May 21, 2004) (finding ALJ's decision not supported by substantial evidence because opinion did not show that scores were seriously considered and weighed); Escardille v. Barnhart, Civ. A. No. 02-2930, 2003 WL 21499999 (E.D. June 24, 2003) (remanding case where ALJ did not mention GAF score of 50 and it was not clear whether score had been ignored or considered).

The Court turns next to the ALJ's conclusion that Dr. Orr's findings were compromised because, despite Dr. Orr's statement "that the claimant has attended all medication checks, . . . treatment records indicate many missed appointments."  Id.  The record shows, however, that while Kuhns did miss multiple counseling sessions which did not involve medication, there is no evidence that he failed to keep appointments with Dr. Orr.

The ALJ also discredited Dr. Orr's assessment on the ground that "the evidence as to [Kuhns's] daily activities do [sic] not support the degree of limitation found by Dr. Orr or alleged by the claimant."  (T. 18).  Dr. Orr, however, stated that Kuhns's mental impairments imposed only mild limitations on his ability to carry out daily activities.  (T. 831). [7]

Dr. Orr's finding that Kuhns had marked limitations in social functioning was discounted because Kuhns had a fianceé and was able to visit with friends.  (T. 18).  The ALJ also extracted snippets from Kuhns's medical records documenting that his anxiety was helped by Seroquel, and that he denied hallucinations, delusions, or psychosis.  Id.  The ALJ ignored, however, other portions of the identical records which showed that Kuhns remained "very depressed" (T. 394), and that his anxiety returned, necessitating a change in medication (T. 400).

Finally, the ALJ found that Kuhns's account of his limitations, which were consistent with Dr. Orr's findings, to be less than credible.  He based this conclusion, in part, on the observation that although Kuhns alleged three back surgeries, the record failed to document any of them.  (T. 20).  The Court's review of the records, however shows that the three surgeries *are* documented; Kuhns underwent percutaneous discectomies on July 24, 1996, in October 1996,

---

[7] He did, however note marked limitations in Kuhns's social functioning, and moderate limitations in concentration, persistence and pace.  (T. 831).

11

and on April 17, 1997.  (T. 855, 862, 865, 875).

The ALJ also found that Kuhns's credibility was undermined by his drug seeking behavior. (T. 18).  Although the record does show that Kuhns may have been addicted to narcotics, it does not support the conclusion that he sought mental health treatment in order to obtain drugs.  Dr. Clark explicitly addressed this issue at his initial meeting with the claimant, telling Kuhns that he would not prescribe addictive medication.  Kuhns assented and continued treatment nonetheless.  Furthermore, the fact that Kuhns may have been addicted to opiates did not prevent Dr. Clark or Dr. Orr from concluding that he suffered from and needed treatment for severe mental impairments.

Although, as a  general rule, courts must defer to the ALJ's credibility determination given his unique opportunity to assess the witness's demeanor, see, e.g., Atl. Limo., Inc. v. NLRB, 243 F.3d 711, 718 (3d Cir. 2001), that credibility judgment alone is not a sufficient reason for rejecting medical evidence of an impairment.  This is especially true where, as here, the ALJ failed to discuss a significant portion of the relevant medical records.

Based on the foregoing analysis, the Court finds that the ALJ did not discuss medical evidence that appears to support Kuhns's claim, and seems to have based his rejection of the medical evidence on grounds that are largely inconsistent with the record.  The Court is constrained to conclude, therefore, to find that the ALJ's determination that Kuhns's mental impairments were not "severe" is not supported by substantial evidence.  As a result, the question posed to the vocational expert was fatally flawed, rendering his ultimate conclusion unreliable.[8]

_____

[8]The Court has considered Kuhns's claims of bias. The excerpted portions of the ALJ's publically posted comments responding to an NPR story about delay in the processing of disability were, at best, improvident, especially for a sitting judge. The Court has no reason to believe, however, that the

III.    Conclusion

        Because the Court finds that the Commissioner erred in ending its evaluation of Kuhns's

mental impairments at step two, it recommends that this matter be remanded for a full and fair

analysis of these claims, and, if necessary, further development of the record pertaining to

Kuhns's mental status.

        In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule

72.1.4 B, the parties may file written objections in accordance with the schedule established in

the docket entry reflecting the filing of this Report and Recommendation.


                                        Respectfully submitted,

                                        /s/ *Amy Reynolds Hay*
                                        Chief United States Magistrate Judge

Dated: 22 July, 2009




cc: Counsel of record via CM-ECF

---

views expressed tainted or will taint the ALJ's principled adjudication of this matter.

13